Michael Flomenhaft
The Flomenhaft Law Firm, PLLC
Attorneys for Plaintiff
90 Broad Street, Suite 1901
New York, NY 10004
(646) 747-0300

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
MICHAEL KRYNSKI,

                                 Plaintiff,

      -against-

THOMAS H. CHASE, JR., and WESTERN EXPRESS INC.,

                           Defendants.
------------------------------------------------------------------X

**NOTICE OF MOTION**

Docket No.: 06-CV-4766
(AMD) (VMS)

| | |
|---|---|
| Motion by: | THE FLOMENHAFT LAW FIRM, PLLC<br>Attorneys for Plaintiff |
| Date, time and Place of Hearing:<br>225 Cadman Plaza East<br>Brooklyn, NY 11201. | At a date and time set by this court |
| Supporting papers: | Declaration of Michael Flomenhaft with exhibits and a memorandum of law |
| Relief Requested: | An order:<br>(1) Precluding the anticipated testimony of defense art expert Eduardo Resto on the basis that he is unqualified and uses information from artfacts.net, an inadmissible/unreliable source and;<br>(2) Precluding the anticipated testimony of defense forensic accountant Ronald Weiner to the extent it relies on Resto's expert opinion and/or information derived from artfacts.net, and;<br>(3) For any other relief this Court may deem proper. |

**PLEASE TAKE FURTHER NOTICE**, that opposition briefs, if any, must be served per the Scheduling Order of the Court.

Dated:          New York, New York
                December 14, 2015

                                        Yours, etc.

                                        Michael Flomenhaft, Esq.
                                        The Flomenhaft Law Firm, PLLC
                                        Attorneys for Plaintiff:
                                        90 Broad Street, Suite 1901
                                        New York, NY 10004
                                        (646) 747-0300
                                         mflomenhaft@neurolawny.com

TO:
Raven & Kolbe, LLP
Attorneys for Defendants
126 East 56th Street, Suite 202
New York, NY  10022
212-759-7466
kraven@ravenkolbe.com

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
MICHAEL KRYNSKI,

                      Plaintiff,

    -against-


THOMAS   H.   CHASE,   JR.   and   WESTERN
EXPRESS, INC.,

                   Defendants.
------------------------------------------------------------------X

Docket No.: 06-CV-4766

(VMS)(AMD)

**ATTORNEY AFFIRMATION**

    Michael Flomenhaft, an attorney duly admitted to practice law in the Courts of the

State of New York, affirms the following under penalties of perjury:

    1.     I am the principal attorney of the law firm of THE FLOMENHAFT LAW

FIRM, PLLC, the attorneys for plaintiffs, and as such am fully familiar with the facts and

circumstances of the within action.

    2.     This affirmation supports Plaintiff's motion for an Order to preclude trial

testimony by Defendants' experts, Eduardo Resto and Ronald G. Weiner, CPA on various

grounds pertaining to expert qualifications and unreliable methodology.

    3.     The following are annexed as exhibits:

A.    Report of Plaintiff's expert Prof. Kathy Goodell, MFA
B.    Report of Plaintiff's expert John Lee
C.    Report of Plaintiff's expert Ronald G. Quintero, CPA
D.    Report of Defendants' expert Ronald G. Weiner, CPA
E.    Deposition transcript: Ronald G. Weiner, CPA
F.    Report of Defendants' expert Eduardo Resto

1

G.   Deposition transcript: Eduardo Resto
H.   ArtFacts.net screenshots
I.   Affidavit and CV of Stephanie Tarras
J.   Affidavit of John Lee

## BACKGROUND

4.      This case involves the February 26, 2005 motor-vehicle collision in which

an 18-wheel tractor-trailer driven by defendant, Thomas Chase, employed by defendant

Western Express, Inc., crashed into Plaintiff, Michael Krynski's Pontiac van. This Court

granted Plaintiff's motion for summary judgment on liability by order dated September

30, 2009. Trial is scheduled for January 19, 2016.

5.      As a result of the collision, Krynski sustained numerous injuries, including

traumatic brain injury (TBI). Before this accident, Krynski was a highly educated,

versatile and prolific artist, whose work was heavily influenced by his childhood in a

politically turbulent Poland.  After the accident, as a result of his brain injury, he became

forgetful, indecisive, apathetic, and, worst of all, unable to create art.  A major issue in

this damages-only trial will be the valuation of Krynski's potential to earn as an artist

prior to the accident.

## A. Plaintiff's Art, His Lost Earnings Claims, and His Experts

6.      Before the accident, Michael Krynski had highly advanced skills in

sculpture, painting, and sketching on paper. He was proficient in working with and

incorporating photography, sewing, woodwork, metal, and ceramics in his art. Krynski's

use of narrative and imagery simultaneously was considering by some experts in the art field as revolutionary. Many experts predicted he was on the verge of innovating a pivotal new trend in incorporating complex and expressive iconic, socio-political imagery into visual art in a manner that was both politically and culturally salient, yet concurrently humorous and uplifting.

7.      Kathy Goodell, MFA is Plaintiff's art expert. She is a full Professor of Art and the Program Head at SUNY, New Paltz and a current, practicing artist. As to Krynski's sculpting, art she reports that although Krynski has a "high degree of technical skills, with process and materials," his "vast skills are never the subject matter of his sculptures; rather they are incorporated into the works cited here, but always in a subtle and well integrated manner. He is a master at direct building methods with both wood and metal." [Exh A at 3.]

8.      As for Krynski's paintings, Goodell wrote:

> "These images are straightforward, they appear simple and direct while containing a statement that is complex and compelling, tending to "grab" the viewer emotionally. In addition, they are very pictorial. The paintings, as in his sculpture, use surprising juxtapositions of image and context. In other words they are alive. The works have multiple layers of meaning…Krynski does so by using images in a simultaneously personal and universal manner. This mode of narrative but ironic imagery is presently *in vogue*, but it was just beginning to emerge when Krynski was working and he sensed it and incorporated it easily into his own creations." [Exh A at 6-7.]

9.     As Prof. Goodell's 14 page curriculum vitae[1] establishes, her education and experience in the art world span decades.

10.     John Lee is Plaintiff's expert on the *art business*. He is art dealer and gallery owner who, in his 26 years of experience in the art industry, has stewarded and nurtured many young artists who have risen on the international scene. He writes:

> "For me, the power of Krynski's sculpture comes from the fact that he was fearless about manipulating scale, and manipulating realism, using it and turning itself upside down resulting in a visual fantasy that has political and cultural meanings." [Exh B at 10.]

> "Mr. Krynski exploits two traditional modes of expression, photography and painting and by combining them his result is unusual in a very good way, expressive, complex, humorous and uplifting." [Exh B at 12.]

11.     Plaintiff also obtained the expert opinion of Ronald G. Quintero, CPA, a forensic accountant.  Quintero is not an expert in art: his role is to establish how Krynski's artistic abilities and career potential translate into dollars.  Utilizing, *inter alia*, the opinions of both Lee and Prof. Goodell as to the quality of Krynski's art and its potential marketability, Quintero quantifies the value of Krynski's lost earning potential. [See Exh C.]

12.     To counter the opinions of Goodell, Lee, and Quintero, Defendants engaged Ronald G. Wiener, a Certified Public Accountant whose qualifications include

---

[1] Also of interest is Prof. Goodell's website, in which some of her recent artwork is shown. See www.KathyGoodell.com.

providing accounting, auditing and tax services, financial consulting and financial services. [See Exh D, Exh E at 34.] Wiener's 34 page report [Exh D] purports to establish that the amount of money Quintero ascribes to Krynski's lost potential to earn as an artist is overly generous.

13.     Under the section of his report entitled "V.  Bases for Opinion",  Weiner includes a subsection entitled "Evaluation of Mr. Krynski's Artistic Skills and Standing" in which he asserts that Quintero's Report "grossly overstate[s]":

> "(a) the level of Mr. Krynski's artistic skills;
> (b) his visibility and standing in the art markets; and,
> (c) the commercial viability of his artwork." [Exh E at 4.]

Wiener then purports to refute the claims of Quintero "and others" (i.e., Plaintiff's art experts) that Krynski was a top artist before the accident or could have become one had there been no accident. He does so by providing his own analysis in the following categories: "peer group, artistic ranking, number of publications, exhibitions, auctions, sales data and career trajectory."  This includes and is based on numerous assertions and opinions on *art*.  For example, Wiener writes:

> ### *"Profiles: Polish Art --Tendencies and Textures*
>
> "Today's young Polish artists look backward throughout our history and create works resembling a hodgepodge of Dadaist banality, Surrealist fantasy, Conceptualist complexity, Junk Art-junk, Pop-Art irony, and Neo-Expressionist anger. And it's all the rage. Poland has something of a "buzz" surrounding its art scene. People go gaga over these young Pols; curators put these works into important contemporary shows; collectors cash in on the rising prices; and major art magazines taut these artists as the "it people." Being a young Polish artist is the hip thing and it is profitable. Since 2005, prices for such works have increased." [Exh D at 5.]

14.    In pages that follow, Weiner directly criticizes the reports of not only Quintero, but also the art experts Goodell and Lee as lacking in what he claims are the proper factors to be considered in performing an analysis of Krynski's artistic ability and the marketability of Krynski's artistic works.

15.    Weiner was deposed on July 9, 2013. [See Exh E.]  He admitted that "other than in a lay sense," he has no education, training or experience in art. [Exh E at 8.] When asked how he could have arrived at his evaluation and assertions pertaining to art, Weiner confided that he had consulted with a friend of his daughter named Eduardo Resto. He stated that Resto, who was a stranger to the litigation at the time, was a professor of art history at Pace University, and that Resto had prepared a writing for him that provided a "basic analysis" of Krynski's art. [Exh E at 13.]

16.    Resto also provided Weiner with a document [marked Exhibit 3 to Weiner's report] which he described as "ranking done by a service called ArtFacts.net which ranks roughly 40,000 artists." [Exh E at 29.] He "satisfied [him]self that it was a credible report" [Exh E at 30] essentially because Resto said so. He testified:

> "Q. What was your basis, other than Dr. Resto, of saying this report was a
>      reliable source for evaluating an artist's standing and talent and
>      potential?
>
> A. I chose to use this source because Dr. Resto described it as being an
>      appropriate source."

17.    Weiner testified that this ArtFacts.net document "is significant to [his] opinion" in this case. [Exh E at 30.]

**C. Defense expert Eduardo Resto.**

18.     On August 6, 2014, Defendants' served a notice of expert exchange designating Eduardo Resto as their expert in art, stating that Resto "is an art consultant and professor of art at Pace University…". [Exh F.]

19.     Resto was deposed on October 17, 2014, at which time Plaintiff learned that Resto teaches *English* at Pace University. He is not a full professor, as the notice (or his CV) implies, but an adjunct. [Exh G at 7-8, 11, 31.]  Although Resto maintained that he has taught four courses at Pace "specifically in art" [Exh G at 13], further inquiry revealed that these were English courses, entitled "Romanticism in the Modern World", "Writing in the Disciplines", and "Victorian literature" that, according to Mr. Resto, dealt with how "aesthetics" relate to literature. [Exh G at 13, 15, 16, 17-18.]

20.     Although Pace has an Art Department that teaches painting and art history, Resto is not part of it and has never been invited to be a part of it.  He has never applied to become a faculty member in any university art or art history department. [Exh G at 11-12, 29.]

21.     Resto is not a painter or sculptor, has never taken a course in any university or art school designed to teach him painting or sculpting, and has never written about painting or sculpting. [Exh G at 19, 26, 28.] His undergraduate degree from the University of Wisconsin was in art history [Exh G at 20], while his CV states that it was in three subjects: "History, Art History, and African-American studies." [Exh F.]  The ten undergraduate art history courses Resto took were predominately in architecture. [Exh G

at 21, 29.] He took one independent study on German painting and aesthetic theory covering the late 19th century to 1919 [Exh G at 23] and only one full course that was specifically devoted to painting, and that was Cuban painting [Exh G at 21, 24].

22.    Resto also has two Masters Degrees from Columbia University, one in American studies and one in art history. For his thesis in both degrees, he wrote on Frank Furness, a 19th-century architect. [Exh G at 27.] While in graduate school, he took a 20th-century modern art course covering the 1960s to the 1980s. [Exh G at 24-25.]

23.    Resto has never worked for an art gallery; has never been asked to perform any sort of art appraisal; and has no commercial experience in the art market. [Exh G at 28, 29.] In the four months before the deposition, he was searching for an entry level research position with an art gallery, writing for art catalogs, which he had never done before. As of the date of the deposition, he had applied to Sotheby's and Christie's but had yet to be invited for an interview. [Exh G at 32, 33, 34.]

24.    Resto has never served as a consultant in connection with art. [Exh G at 7, 28-29, 40]  This case represents his first consultation in connection with art ever. [Exh G at 28-29.] He arrived at the amount for his expert fee by Googling it. [Exh G at 42-43.]

25.    In performing his sales analysis and analysis of Krynski's career trajectory, Resto relied heavily on a website entitled ArtFacts.net. [Exh G at 68.] Apparently, after doing some research on the Internet, Resto concluded that ArtFacts.net was an authoritative site. He testified:

> "Q. What was your basis for saying that this was an important authoritative site?

A. It's a site that's used all throughout the art world and it's a site that investors use as well to gauge the price points of art.

Q. Where'd you get that information from?

A. I researched pertinent indices to see which one would provide the necessary data that I would use.

Q. Which indices?

A. I used ArtFacts.net as well as I used the Sotheby's site and I used the Christie's site to sort of see sales figures and things like that and to see how those reports may be comprised, and I decided ArtFacts.net, because of the comprehensive overview provided about an artist, you can really see -- one can see an artist, not only an individual artist but an artist compared on the same grounds to other artists.

Q. Have you ever seen any articles or literature that endorses ArtFacts.net as an authoritative source as you've used in this report?

A. It's my own conclusion.

Q. You haven't seen any other authoritative source which endorses ArtFacts.net as a reliable source?

A. No, but it's the one that a gallery and that I – that – it's the one that I believe most galleries use." [Exh G at 69-71.]

*       *       *

"Q. When you say you believe that most galleries use this index, ArtFacts.net, what's your basis for that belief?

A. It's one of -- I believe that it's the site that has the most comprehensive overview of an artist's career and trajectory and

9

earnings.  It also provides up-to-date information about biography as well as – as well as other -- as well as other artists who have similar tendencies.

Q. My question is, is it fair to say you have no personal experience that supports a statement that ArtFacts.net is used as a reliable source in the art evaluation world? Is that fair to say?

A. Correct." [Exh G at 71-72.]

**D.  The ArtFacts.net website.**

26.    ArtFacts.net claims to be "an international guide for modern and contemporary art," providing "an online structure for art institutions and internet users to offer an insight into the current state of the contemporary art world." [See Exh H, page 1.] It was created by Marek Claassen, a "multimedia entrepreneur" who, according to the website, "studied Business Administration and has many years experience working with various galleries and software companies." [See Exh H, page 2.]

27.    ArtFacts.net established a ranking system in 2004, the purpose of which is to rank artists based on their success in "exhibitions held on an international level since 1996." [See Exh H, page 3.] ArtFacts.net does not consider the quality of an artist's work or an artist's sales, and does not select artists who don't have substantial international representation. [See Exh H, pages 3, 4, 5.]

28.    ArtFacts.net ranks artists solely based on "exhibition data" [See Exh H, page 5]. The ranking system excludes quality and sales because the website claims the success of an exhibition is a more appropriate evaluation of artists "according to their

recognition in the eyes of professionals" (i.e., fame and popularity). [See Exh H, pages 3, 5.]. Only galleries that register with ArtFacts.net and meet the website's specific criteria are included in the ranking system. [See Exh H, page 6.]

29.    According to ArtFacts.net's own "Ranking Disclaimer," the artist ranking tool "is for information purposes only, and is not intended for trading purposes. The electronic chart is based on the data currently available to ArtFacts.net and should only be viewed as an aid to understanding an artist's exhibition career in relation to the other artists stored in the ArtFacts.net Artist Ranking." [See Exh H, page 7.]

**E. Commentary on ArtFacts.net and its usage by art professionals.**

30.    Stephanie Tarras is the Associate Director at Hammer Galleries in Manhattan.  She holds a BA degree in art history from Barnard College, and unlike Resto, has been working in various art galleries (first as a student intern and later as a paid employee) since 2008. [See Exh I.]  Plaintiff submits her affidavit solely for the purposes of this motion.

31.    Ms. Tarras states that in her experience working in art galleries:

> I have never used ArtFacts.net or its ranking system, nor has anyone employed at Hammer Galleries. I am not familiar with anyone in the art world that uses ArtFacts.net. In my opinion, as a professional in the field, ArtFacts.net's ranking system is invalid as a source for determining an artist's talent, career success and exposure in the art market (standing) because it is not used by art experts, and its methodology is flawed and contradicts established practice in the field. [Exh I at ¶ 4.]

11

32.     Plaintiff also submits an affidavit from his expert and gallery owner John Lee, who states that ArtFacts.Net is:

> "is utterly useless to evaluate the younger artist, who, as in the case of Michael Krynski, has only several auction records. The idea of using something like ArtFacts to say anything at all about an artist like Michael Krynski would be like saying that a company that isn't on the New York Stock Exchange has no value and no future worth as a company. This ranking tool cannot be used to shed any light on the prospects of the young and emerging artist." [Exh J at ¶ 9.]

**F.  Preclusion of Resto and Weiner.**

33.     As discussed in the accompanying Memorandum of Law, Resto should be precluded from serving as an art expert in this case because he is not qualified in either education, experience or training. In the event this Court disagrees with Plaintiff's position as to Resto's qualifications and allows him to take the stand, the Court should preclude any opinions of Resto's that are based on the ArtFacts.net website, which is essentially the entirety of Resto's opinions. Besides being pure hearsay, ArtFacts.net is subjective, controversial, unreliable, and fatally flawed. Finally, Defendants should be precluded from introducing any testimony from their accounting expert Wiener, who admittedly is not an expert in art, that is based in whole or in part on information or opinion derived from Resto and/or ArtFacts.net. More specifically, Wiener should be precluded from offering any opinions as to the evaluation of Krynski's artistic ability and potential to earn as an artist.

Wherefore, it is respectfully submitted that Plaintiff's motion be granted its entirety.


Dated:        New York, NY
              December 14, 2015

              _____
              Michael Flomenhaft