FILED
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.

★ MAR 0 8 2016 ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------- X

Michael Krynski,

                             Plaintiff,

           – against –

Thomas H. Chase, Jr. and Western Express Inc.,

                      Defendants.

: **<u>MEMORANDUM DECISION AND ORDER</u>**

: 06 Civ. 4766 (AMD) (VMS)

---------------------------------------------------------- X

**ANN M. DONNELLY**, District Judge.

The plaintiff, an artist, initiated this personal injury lawsuit in 2006 against the defendants Thomas H. Chase, Jr. and Western Express, Inc., following an automobile collision in late February of 2005. The plaintiff originally filed suit in New York State Supreme Court, Kings County on August 1, 2006. On August 29, 2006, the defendants removed the action to this Court pursuant to 28 U.S.C. § 1441(a)-(b) and this Court's diversity jurisdiction, 28 U.S.C. § 1332(a). Because it was undisputed that the defendant Thomas Chase hit the plaintiff from behind, the Honorable Roslynn Mauskopf granted the plaintiff's motion for partial summary judgment on the issue of liability on September 30, 2009. *Krynski v. Chase*, 707 F. Supp. 2d 318, 321 (E.D.N.Y. 2009).[1] A bench trial on the issues of damages, including whether the plaintiff sustained "serious injury" under New York State Insurance Law § 5102(d) began on January 19, 2016. The plaintiff claimed that he suffered traumatic brain injury, and that as a result he could no longer work as an artist.

---

[1] The case was reassigned to the Honorable William Kuntz II on November 7, 2011, and then to this Court on November 5, 2015.

During the trial, the defense moved for a judgment on partial findings,[2] arguing that the plaintiff had failed to establish that the collision was the proximate cause of any injuries, and that in any event he had failed to prove that he suffered serious injury. The plaintiff opposed the motion, but agreed that all of the evidence on the collision itself and on the plaintiff's alleged medical condition had been introduced. The Court granted the defendants' motion. This memorandum explains the bases for that decision.

## FINDINGS OF FACTS

The only evidence that the plaintiff presented about the collision itself was his own testimony, documentary evidence, and the testimony of his chiropractor, whom the plaintiff consulted in the days following the collision. On the subject of the claimed injury, the plaintiff's case was almost exclusively based on the testimony of various experts, all of whom were consulted and retained solely for the purposes of this lawsuit, and all of whom did their examinations long after the collision. The defense introduced the testimony of Thomas Chase, as well as two experts who analyzed the evidence from the collision.[3] I credit Mr. Chase's testimony in its entirety, as well as the testimony of the two defense experts. I do not credit the plaintiff's version of the collision, or his allegations of serious injury. I conclude that the testimony of the various experts offered by the plaintiff did not establish that he suffered a serious injury as a result of the collision.

On February 26, 2005, Mr. Chase, a truck driver employed by Western Express, was driving his 18 wheel truck southbound on the Bruckner Expressway, in Bronx, New York, in stop and go traffic. At about two o'clock in the afternoon, when Mr. Chase was driving between twenty and twenty-five miles an hour, he saw the plaintiff's Pontiac minivan stopped in front of him. He

---

[2] Although the defense moved for a "directed verdict," I am treating the motion as made pursuant to Rule 52(c) of the Federal Rules of Civil Procedure because this was a bench trial.

[3] Because of scheduling reasons, and for the convenience of the witnesses, some of the witnesses testified out of order. Thus, some of the defense witnesses testified before the plaintiff concluded putting on his case.

applied the brakes, but could not stop. Mr. Chase hit the rear of the plaintiff's car at a speed of approximately five miles an hour. The plaintiff's car, in turn struck the vehicle in front of his car. Mr. Chase, the plaintiff, and the driver of the third car all got out of their cars; at one point, the driver of the third car told the plaintiff, "It's a trucking company, sue them, say that you're hurt." (Tr. at 679.) Police officers responded to the scene, interviewed the parties, and filled out an accident report, the narrative portion of which indicated that both the plaintiff and the driver in front of him had slowed for traffic, that Mr. Chase's truck was travelling too close to the plaintiff's car, that the plaintiff's car was pushed into the rear of the first car, and that none of the parties claimed any injuries. (Plaintiff's Ex. 1.) The plaintiff's car sustained damage to the rear gate and to the front, but was not totaled.[4] The plaintiff was able to drive, and left the scene in his car.

The following day, the plaintiff, a Brooklyn resident, went on his own to the emergency room of Beth Israel Hospital in Manhattan. His medical records demonstrate that he complained of neck pain; examination and x-rays revealed no spinal injury. (Plaintiff's Ex. 4.) He was prescribed ibuprofen and advised to see a family practice physician named Dr. Phillips.

Two days after the collision, on February 28, 2005, the plaintiff met with his chiropractor, Dr. Alex Eingorn, whom the plaintiff had seen periodically since 1997 for a variety of ailments, including an "immobile and twisted" neck, a ski related injury, and a football injury. (Tr. 252, 254.)[5] Dr. Eingorn—who had no medical degree but nonetheless claimed expertise in a broad array of medical specialties—believed that the plaintiff had suffered traumatic brain injury, a concussion, and possible spinal cord damage as a result of the collision, and recommended that he see a neurologist. Despite his purported concern for the plaintiff's health, he did not make an

---

[4] The estimate to repair the plaintiff's car was $5,435.23. (Plaintiff's Ex. 3.)
[5] According to Dr. Einhorn, the plaintiff telephoned him on the day of the collision, and said, "Hey, doctor, I just got hit by a truck. My neck is sore. Do you mind if I come over for an adjustment?" (Tr. 255.)

immediate neurological referral; instead, he made the referral for two or three days later, because he felt that "it was too much information" for the plaintiff to "absorb." (Tr. 269.) He did, however, believe that the plaintiff might need legal representation, so he made an immediate referral to plaintiff's counsel, Mr. Flomenhaft, whom Dr. Eingorn had met in connection with another personal injury trial. (Tr. 270–71.)

On that same night, after his appointment with Dr. Eingorn but before any appointments with a neurologist, the plaintiff emailed a business associate named Eric Liebert. (Plaintiff's Ex. 12.) In the email, the plaintiff wrote that he had been in a "horrific car crash" two days earlier, that he had spent "the last 3 days" in "hospital emergency rooms, Dr's offices etc.," and that he might not be "functional for a while." The plaintiff predicted that "[m]ost likely I'm going to have to put my affairs into a lawyers [sic] hands." The plaintiff also wrote that he would "[m]ost likely" need a "statement" from Mr. Liebert "about my future income loss due to disabilities, as I am physically unable to work." The plaintiff offered to "manage the project, engineer it, design it, hire/find people, and consult with you – but I think my role unfortunately will have to be more behind the scenes and not in the trenches."[6]

On March 2, 2006, the plaintiff had an appointment with Dr. Madhu Boppana, the neurologist to whom the chiropractor referred him.[7] Dr. Boppana referred the plaintiff for an MRI on March 3, 2006 which, other than a possible sinus infection, was normal.

In the years following the collision, the plaintiff, an artist, went on ski trips, snorkeled in the Caribbean, traveled to Australia, and drove, by himself, back and forth to Florida. He also participated in the care of his young child. He did not, however, create any additional art, nor did

---

[6] The email also included an invoice for $30,204, which the plaintiff claimed he was owed in connection with work already done as of February 28, 2005.

[7] According to Dr. Eingorn, Dr. Boppana had mysteriously disappeared by the time of trial.

4

he sell any of the pieces in his inventory. The extent of his actual medical treatment throughout the years was not especially clear. There was no evidence that he underwent any physical or occupational therapy. While he saw Dr. Eingorn for periodic "adjustments," most of his medical consultations were in furtherance of this lawsuit rather than for any real treatment.[8] The experts claimed that the plaintiff had suffered some kind of brain trauma, and almost all of them attempted to connect the alleged injury to the 2005 collision.

Thus, Dr. Michael Lipton, a neuroradiologist, evaluated the plaintiff in December of 2006, nearly 22 months after the accident. Dr. Lipton found evidence of brain bleeding that was not present in the March 2005 MRI. Dr. Monte Buchsbaum did a PET scan of the plaintiff's brain in 2006 and determined that his brain volume was lower than normal. Dr. Jeanette Wasserstein, a neuropsychologist, evaluated the plaintiff in 2008 and 2014, and opined that he had below average skills in a number of cognitive areas. Dr. Christos Davatizkos, a neuroscientist, also measured the plaintiff's brain in 2013. He found that the left side of the plaintiff's brain was smaller than the right side of his brain, which indicated brain volume loss. Dr. Mehrdad Golzad, a neurologist, performed a sensory exam in 2013, and concluded that the plaintiff had an equilibrium problem that affected balance and coordination. Dr. Golzad recommended cognitive and physical therapy but the plaintiff never followed up on any of his recommendations. Dr. Lawrence Amsel, a psychiatrist, saw the plaintiff for the first time in 2014. He concluded after a two hour evaluation that the 2005 collision caused the plaintiff to suffer from posttraumatic stress disorder akin to the trauma suffered by first responders to the World Trade Center terrorist attacks, soldiers who had

---

[8] Indeed, the only professional who seems to have treated the plaintiff immediately after the accident, aside from the elusive Dr. Boppana, was a psychologist named Dr. Ryder. Although Dr. Ryder was apparently present in the courthouse during the trial, he did not testify. Plaintiff's counsel sought to introduce the doctor's records without calling him as a witness, and without subjecting him to cross-examination, which the court did not permit.

endured combat and bombings, and a rape victim.[9]

The only expert evidence on the collision itself came from two defense witnesses, John Scott, an accident reconstruction engineer and Dr. Lawrence Thibault, a biomechanical engineer with a specialty in the mechanics of brain trauma. Mr. Scott's task was to calculate the change in velocity, or "Delta V," of the plaintiff's car at the time of the collision. In order to make that determination, he examined the plaintiff's car, photographs of the car after the collision, the police report, depositions, and the repair estimate. He also considered crash test data involving similar cars. Based on his evaluation of all the evidence, and using a computer program, Mr. Scott concluded that the change in velocity caused by the rear end collision of the defendant's truck with the plaintiff's car was ten miles per hour and that the change in velocity caused by the front end collision of the plaintiff's car with the third vehicle was five miles per hour. (Tr. 701–02, 720.)

Dr. Thibault was retained to determine whether the mechanics of the collision—the "crash loading environment"—was sufficient to cause the traumatic brain injury, or "diffuse axonal injury," that the plaintiff claimed to have suffered. As part of his analysis, he used Mr. Scott's Delta V calculations and also examined the police report, various medical records, expert medical reports, photographs, depositions, and the repair estimate. Dr. Thibault concluded "[t]he crash environment didn't produce the requisite injury mechanism or the head accelerations required to exceed the tolerance for the production of [diffuse axonal injury]." (Tr. 734.)

During separate depositions in 2008, defense counsel asked the plaintiff and his wife about their earnings during 2003, 2004, and 2005. Shortly after the depositions, the plaintiff and his wife

---

[9] The plaintiff also called two witnesses, Kathy Goodell and John Post Lee, to testify about the value of his art, and his earning potential as an artist. Both were effusive in their praise of the plaintiff's work. However, neither could explain any objective basis for their opinions. Mr. Post Lee went so far as to say that the plaintiff had the potential to earn "in the high six figures" and "up to . . . seven figures" for his work. (Tr. 473.) Curiously, though, Mr. Post Lee, a gallery owner, had himself never purchased any of the plaintiff's work.

filed amended tax returns for those years. In his initial filings, the plaintiff reported negative

income in 2003 and 2004, and that he earned only $5,597 in 2005. In his amended filings,

however, the plaintiff claimed to have earned far more in those years: $67,067 in 2003, $90,339

in 2004, and $41,616 in 2005. (Plaintiff's Exs. 184–86, 191.)[10] The plaintiff maintained that he

filed the amended returns not in response to the deposition questions about his income, but because

an unnamed immigration official had advised him that his earnings were too low to permit him to

sponsor his wife's application for a green card.

## DISCUSSION

A judgment for the defense under Federal Rule 52(c) is appropriate when a plaintiff fails

to make out a prima facie case or where the court concludes that the preponderance of the evidence

goes against the plaintiff's claim. *See* Fed. R. Civ. P. 52(c) advisory committee notes. *See also*

*LaMarca v. United States*, 31 F. Supp. 2d 110, 123 (E.D.N.Y. 1998); *Stokes v. Perry*, 997 US Dist.

Lexis 20197 (S.D.N.Y. 1997) (citations omitted). A judgment pursuant to Rule 52(c) "operates as

a decision on the merits in favor of the moving party." *In re Regency Holdings (Cayman), Inc.,*

216 B.R. 371, 375 (Bankr. S.D.N.Y. 1998). A court considering a motion under Rule 52(c) "acts

as both judge and jury," and "weigh[s] the evidence, resolv[es] any conflicts, and decid[es] where

the preponderance lies." *Id.*

In this case, it was the plaintiff's burden to prove that he suffered a serious injury, and that

the 2005 collision was the cause of that injury. *See Narumanchi v. Am. Home Assur. Co.*, 317 F.

App'x 56, 58 (2d Cir. 2009) (motorist had a burden to prove that the motor vehicle accident caused

the stroke he suffered two weeks post-accident). Based on the evidence before me, the plaintiff

failed to prove that the collision caused serious injury, or that he suffered any injury at all as a

---

[10] The plaintiff's counsel apparently referred the plaintiff to an accountant for this purpose; according to defense counsel, the first accountant to whom counsel referred the plaintiff refused to participate in the amended filing.

result of the collision. The credible testimony established that the collision was little more than a fender bender; the straightforward testimony of the truck driver, Thomas Chase, was supported by the physical and documentary evidence, including contemporaneous reports and photographs, and by the testimony of John Scott, the accident reconstructionist, and Kirk Thibault, the biomedical engineer. That evidence made it equally plain that the plaintiff suffered almost no injury.

The plaintiff's witnesses, including the plaintiff himself and an array of hired experts, were not credible; it would take pages to catalog every instance of bias, speculation, evasion, and sheer absurdity that characterized their testimony. Suffice it to say that almost to a witness, they were motivated only to make the plaintiff's condition look as bleak as possible, and blame that alleged condition on the defendants.

A simple recitation of the timeline of events demonstrates that from the outset of this case the plaintiff saw this minor collision as an opportunity to cash in, and took a series of steps designed to accomplish that result. The credible evidence established that the plaintiff told responding police officers that he was not injured, and that he drove his car away from the scene. Records from the emergency room visit the following day also prove that he had not suffered any serious injury. However, he then consulted his chiropractor, whose first instinct was to refer him to a personal injury lawyer. That same night, before he had received any diagnosis or seen any other doctors, the plaintiff sent an email to an associate that was patently designed to set the stage for this frivolous lawsuit; in that email, the plaintiff falsely claimed to have been in a "horrific" accident, that he had spent days in emergency rooms and hospitals, that he would have to put his affairs in the hands of "a lawyer," and that he would need a statement about his lost future earnings because he was "physically unable to work."

In the years that followed, almost every step the plaintiff and his lawyers took was

consistent only with sustaining this lawsuit. There was no testimony that the plaintiff had ever had any real treatment for his supposed injuries.[11] Every expert, medical or otherwise, was consulted purely for the purposes of advancing this lawsuit. Some of them, despite impressive academic credentials, were willing to make outlandish statements about the plaintiff's condition; one witness compared this utterly quotidian traffic accident to the terrorist attacks on the World Trade Center. The plaintiff even went so far as to amend tax returns that were years old, attempting to create the illusion that he had a significant income, presumably in an effort to pump up his damages claim, suspiciously right after he was apparently confronted about his lack of income during a deposition. Other steps taken by the plaintiff's team—including the wholly frivolous and transparent step of having his wife appointed his guardian—merely underscore that this lawsuit had no merit whatsoever.

## CONCLUSION

For the foregoing reasons, judgment as a matter of law is granted in favor of the defendants due to the plaintiff's failure to prove the motor vehicle accident caused the alleged injuries and that the injuries were serious under the definition of New York State Insurance Law § 5102(d) and related New York State case law.

SO ORDERED.

Dated: Brooklyn, New York
March 8, 2016

s/Ann M. Donnelly

ANN M. DONNELLY
United States District Judge

---

[11] Given his ability to ski, snorkel, and travel around the world, it does not appear that any treatment was necessary.